Okay, who is the appellee here? Which of the two of you? I'm sorry. I'm sorry. Excuse me. Who's the appellant? My mistake. Sorry about that. I am, sir. Jason Eatmon. Okay. You've got 15 minutes. You can reserve as much of that time as you'd like for rebuttal. Just tell us how much and we'll make a note of it, okay? I'd like to reserve three minutes.  Okay. That's fine with us. Okay. Okay. You can start. Okay. Thank you, your honors. Yeah. May it please the court, my name is Jason Eatmon and I'm clearly appearing pro se. I'm asking the panel to reverse the denial of my discharge and remand with instructions to enter a discharge consistent with the judgment entered for my wife, Christine. This appeal is not about whether my schedules were perfect because they were not. It was about whether 727 was applied even handedly to two debtors on an indistinguishable record and whether a dormant, fully exposed contract and corrected omissions can legally amount to knowing fraudulent concealment. Can I ask you a question just so I'm not going off on the wrong track here? I mean, I hear your argument about you think that there was inconsistency between the dispositions between your wife and you, but with respect to the contract, I mean, that was not relevant to your wife one way or the other, right, or was it? It was not a contract with her name on it, sir. Okay. So to the extent the bankruptcy court relied on that, that's just an issue we should look at discreetly. Is that fair? Yes. Yes, Your Honor.  Thanks. I feel like that's fair.  Okay. So, yep. Lost my place. Knew that was going to happen. Okay. So I'm asking you to correct two legal misapplications of 727, one, uneven application between two debtors and indistinguishable record, and number two, treating a long dead, fully exposed contract and a set of corrected schedule missions as the kind of knowing fraudulent concealment that justifies the extreme penalty of a denied discharge. I'd love to tackle these two issues in whatever order you'd like. I like this hot bench thing more than me reading. That's fair. Why don't you focus on the book and the contract, and I think as it was developed and has come through to us, it's not really the book, it's the existence of the contract and its continuation through the petition date, which was the concern and really the genesis of the ultimate finding. I think, as Judge Lafferty has indicated, I understand your comments about your wife's ruling, but that is not the basis that we judge the decision as to you. We look at the facts as to you, so I think your time is best served by trying to incorporate that specifically. My understanding is largely the court surveyed everything but really focused on the failure to disclose the contract as the basis for the denial of your discharge. Is that how you understand it? Thank you for that point. I saw it as two different things, but I'm more than happy just to focus on the book contract if that's helpful to your honors. I think that's probably the area we're more interested in. Instead of me reading, I'm going to frame it as I see it, and I'd love to be hot benched along the way. I think we started a bad precedent here. I read the term when I was preparing, and I'm like, what does that even mean, and now I know. Well, you'll be a regular here now, right, just watching? Well, I'm going to subscribe to the channel for sure. Concerning the book contract, yes, there was a book contract. We signed it back in 2018. I don't remember the exact date. That was a contract between myself and a co-author. The co-author and myself had a contract with Wiley, the publisher. There were many aspects to a contract as there always is, and I think the thing that's important here is that there was this payment of this $12,500 done at the onset of the contract many, many, many, many years before bankruptcy was filed. That's not in denial. That money was spent. That said, the contract required me to go produce documentation, print manuscripts, and it never happened. So, lots of things happened, including COVID, and so the contract just kind of died this anemic death. There was no correspondence with the publisher, no correspondence with the co-author, who by the way, in the meantime, wrote five or six other books with the publisher, skipping over the book that I had. I was able to produce no communication with either the co-author or the publisher because none existed, and so they were subpoenaed, and again, no correspondence outside of the initial contract signing back in 2018 or 2019 was uncovered, showing that it was reasonable that I had forgotten that this contract was in existence. I mean, the dates had come and gone. Nothing in the contract was fulfilled, and no one had even said anything to me, so it was just forgotten on the initial submission for bankruptcy paperwork, on our initial submissions. So, when it was brought up, however, in cross-examination with opposing counsel, everything was exposed. We talked about it openly. We asked questions. There was not a bunch of I don't knows outside of the fact that I didn't have any communications. I don't know how the publishing industry works. I'm not a writer. I've never published a book before. My co-author is a very established author that's written many, many, many books. There's no manuscript, no correspondence, and I just thought the contract was dead, and the dates support it. The contract itself supports the fact that it's dormant, and so when it brought up, I feel like in court, it was positioned as this active, monetarily valuable. I think that the court, I don't know if the court really thought it was valuable, except that it could have been. In another situation, another fact pattern, it could have been, and that gets to the whole obligation of the disclosure at the beginning, so that the trustee can figure out if it is or isn't. I think that's where you're getting caught in the 727, is the debtor's obligation to do that, so that the trustee starts with a fair disclosure of what could be, regardless of whether it turns out to be. The court actually specifically found that you concealed it with the fraudulent intent, so it rejected as a factual matter that there was a reasonable basis for that. Why is that error? Thank you, Your Honor. I don't have any idea how someone could see something that was innocently forgotten, fully exposed and discussed, and then later known to the trustee and done nothing with it. It feels like I had no idea that in that section about contracts that I should have written every dormant contract that I have or expired contract. Can I ask you a quick one? I think I just heard something there that maybe I should have heard it before. There's a difference between, I totally forgot about it, and I knew about it, but it's not worth anything. Did you change your mind about it at some point? Thank you for that opportunity to clarify. When we initially filed for, which was initially a Chapter 13, it was just forgotten. I haven't discussed it with anybody for several years. It wasn't even something that came to mind when we were filling out the paperwork. Okay. When it was brought up is during examination from opposing counsel during our depositions, I think is when it first came up. In what case? In the adversary proceeding. Okay. I have a recollection that this may have also been brought up in a pre-petition case involving the creditors. Forgive me, Your Honor. I don't know what that means. Your creditors, the Lockwoods, didn't they start a lawsuit against you prior to the bankruptcy? Yes. The reason I have the bankruptcy is because of that. Within that lawsuit, did the contract ever come up? Yes, it did.  They wanted manuscripts, but none existed. Yes, it came up. It's not like I wouldn't have known that there's a contract in place. Somebody would say, hey, do you have a book contract? I said, oh, well, I don't think so because it's dead. I didn't remember it to be any type of asset when we filled the paperwork. There's a gap there too, Your Honor. I'm not trying to make excuses, but I want to paint the picture of duress. When we initially filled this out, we did not even think about that as some asset because we didn't even remember it. Then when it was exposed during depositions, we openly discussed it. I think all of the evidence submitted supported the fact that we had no correspondence and it seemed very reasonable and plausible that we could have forgot about it and also that it had no value once it was exposed. I guess I'm trying to say I forgot about it. Then we exposed it. It was determined that it had no value based on my layman definition and in accordance with my bankruptcy counsel. In fact, there was even confusion on whether it should be a creditor because if I didn't submit the manuscript, I technically owed them the $12,500 which, by the way, isn't actually payment. It's like a loan against book sales. Unless the book sales, I still owe the money back. Once we started talking about it, we didn't even know where to put it. Even getting at the kind of prophylactic reason why we want people to do these things, had you listed them as a creditor, the trustee might have said, oh, what's this about? That's kind of what we're getting at here. One is, did the judge make a clear factual error in his determination that you knew about this and didn't disclose it and that it mattered enough? Secondly, the policy behind this, which is even if this one thing isn't worth a million bucks, we don't know that until we know it. Until the trustee knows, they can't pursue things. Sometimes there's a very indirect benefit. You may disclose this and it may hint at something else that the trustee does want to go find and might be about. That's why this probably seems like kind of a harsh result, but there's a lot of policy reasons why we don't want people to be editors. We don't want people to editorialize, oh, I don't think this is worth anything, so I'm not going to list it. That's just built into the code, whether we like it or not. Yes, Your Honor. This is where I'm going to show you prosaic-ness, if that's an adjective. I don't have any idea how that section, I think it was section G, is worded, but I don't recall it saying active or dormant. It might. I don't recall seeing something that would have triggered dormant-ness. That's the problem with the evidence that was presented, because there was a declaration in Ms. Vargo, I believe her name is, with Wiley, that did have the emails that did show that Wiley was continuing to consider that dormant, not extinguished. Yes, Your Honor, but yes, thank you for that. I appreciate that. You're also into your time for reply. If you want to pause now, you're at about two minutes. Should I answer that? Yes, just pause now, if you want. You can come back and deal with that in your two minutes. Okay, thank you. Thank you. May it please the Court. Jamie Dreher for Applebee's, the Lockwoods. My comments are going to be brief, and what may not surprise you, as an Applebee, are going to be focused on the standard of review, burden of proof, especially with respect to credibility findings. Before you launch into that, and I appreciate the credibility, we certainly expect that, do you agree that the Bank Street Court's decision on Mr. Eatman's discharge was based solely, really, on the nondisclosure of the book contract? I will respond directly, and I don't think so, and I'll tell you why. And I've studied the ruling. I read it a bunch more last night and this morning. And so, I would describe the findings, in fact, and conclusions of law as working together. So, a few things. One, yes, in his conclusions of law, he did say, I'm going to focus on the book. That's, I think, the phrase he used, and that's what he talked about when the judge issued his conclusions of law. That said, in his findings of fact, the judge did address and go over the 21 other approximate misstatements and omissions from the schedules. But there has to be a specific concealment. There has to be something that was concealed, right? And reading the facts, there was a lot of concern about bad acts, but the thing that was concealed was the book contract, nothing else. Well, was there something else that was concealed? Yes, Your Honor. That the court found that was concealed and not explained? I don't think the court had made that finding with particularity. I would suggest, just to follow up with that, that in reading the BAPS litigant manual, I found the case all that says BAPS can affirm for any reason supported by the record. And the list of concealments is detailed with specific citations to the record at pages 11 to 13 of our brief. I'm not going to give you the laundry list like maybe we did at trial, life insurance policies, retirement accounts. And to the panel's earlier question to Mr. Eatman, there is a policy issue here, which is like the debtor doesn't get to decide or the debtor's counsel what to list and what not. Well, I don't think the book is worth it. But that's not quite – the debtor doesn't get to decide. That's absolutely right. The debtor loses his or her discharge only if that failure was a fraudulent intentional  So there's no dispute that the contract was not listed. We're there. Was that act of not listing it fraudulently made? Your Honor, the court found so, and the court found so based on a determination of Mr. Eatman's credibility, which is only over – Credibility as to what? The book contract? Why it wasn't listed. Why it wasn't scheduled. What value it had. Whether or not he had communication with the publisher. So the burden of proof then shifts after we made that case, and the burden shifts to the debtor in 727 cases to come up with the explanation and convince the court otherwise, and Mr. Eatman didn't do it. Well, let me pull that apart a little bit, OK? We almost always get to a fraud determination based on inferences, right? It's the rare person who comes in and says, yeah, I was trying to fool you the whole time. You got me. So we're dealing with inferences here. One inference is, was this thing valuable? I mean, would we infer that the person didn't disclose it because it was valuable or is going to become valuable? And there are some rights that are going to, you know, that are presently maybe a little dormant or not, you know, not realizing cash right now that might do so later. So, I mean, that's a classic instance of, yeah, there's a reason. It's believable why this person wouldn't have disclosed this and they did it intentionally to get the asset for themselves and not somebody else. That doesn't seem to be the case here, OK, from what I can tell. What you might be saying is in your comment that there was some credibility issues and a lot of other things kind of in the miasma here is Judge Sargis, based on a whole bunch of things that we're not dealing with this contract, just determined that, well, I just don't think this guy's telling the truth and therefore I'm going to assume he's not telling the truth about this contract. I mean, if that's what you're saying, that's really a very different argument. I think that's true. That's a fair way to interpret his ruling. OK. And what I'm worried about, and I think Judge Spraker said it better than I'm about to, is we're going to turn this into a strict liability question. It is not my job to judge plausibility, but the idea that I entered into this contract X years ago, I don't know how to write a book. You know, to be blunt, the other guy's going to write the book. I'm going to tell him stories. I got a $12,000 deposit years ago. I haven't done a darn thing on this. I don't think I'm going to. You know, that's a very plausible story in terms of did he really intend to defraud or was there any present value to this thing? No. But, you know, what we're stuck with is the judge did make a ruling. But my policy concern is this is turning something that does require a fraudulent finding into something that's practically strict liability. So if you have any comments, and I know that there's a bunch of reasons why we don't want debtors to be their own editors. We don't want them deciding what should be disclosed and what's not. I get all that. But this troubles me because I just think that there's, you know, I don't get to re-decide this. But there's a lot of plausibility behind what the debtor's telling us here in terms of why he didn't think this had any value and why, in his mind, it didn't have to be disclosed. I appreciate that, Your Honor. And with respect to the judge's findings on credibility and not believing that testimony, you can see in the record and you can see in the judge's factual findings that part of the underpinning for that was the miasma or the constant other failure to disclose. Trailers sold, storage unit, retirement accounts, bank accounts. We wouldn't be here, Your Honor. And I'll just throw this out here as a discussion point. For example, we found 21 omissions and misstatements in the schedules and SOFA. Okay. Well, one small category of those was these bank accounts with the kids. So the debtors were listed as, you know, co-owners of these bank accounts with their children. Those weren't listed. If that was all that was there, we wouldn't be here. Okay. I'll admit and say and acknowledge that. And I think that goes partially to your point. We wouldn't be here. So with respect to materiality, that's not grafted onto the false oath component of denial of discharge. But I don't think any judge would deny discharge based on a failure to disclose four bank accounts that their kids were on that they forgot about. It's when you add up all the other things and then in addition get and finally get to the book where it all becomes rather troubling. And secondly, with respect to bringing back standard review, when there are two permissible views of the evidence, the bankruptcy court's choice between them cannot be clearly erroneous. And I think that's what we have here. But the problem that seems to present is, you know, pulling one instance, the court remarked that Mr. Eatman had a repeating failure to remember on other matters. Seems like he remembered as to the book, right? So what do all those other bad acts establish as to the book, right? Or is it just that he evaded and did other bad things, and therefore I am going to deny credibility in his explanation, which was really uncontested otherwise. It actually supported, quite honestly, by Ms. Vargo's declaration, that I can find as a matter of credibility alone that he must be lying on that and is actually fraudulently intending to conceal that. I think that's the ruling and that's a fair interpretation of it. But why is that not clearly erroneous if there's nothing as to the book that suggests an implausibility or a lack of truthfulness? So I think, Your Honor, a couple of things. One is, I mean, part of, like, the overview to this case is, here's a difficulty representing a creditor in a bankruptcy case. When debtors don't fully disclose, I'm pulling back just half a step, really shifting the burden to the creditor to, we started this case trying to find out where the buyout money from the buyout company went. But the problem with that, Mr. Dryer, is that should every Chapter 7 trustee then bring a 727 action against every pro se, especially when they don't file anything and they file the bankruptcy and the schedules are blank, essentially? Does that mean that really what should happen in that instance is that everybody should be facing a 727? I don't think so, Your Honor. I think that where I was going with that is we had to do the work to uncover all the lies, you know? And that's going back to the policy issue of, like, the debtor's responsibility in order to get a discharge is pretty simple. Disclose everything and tell the truth, you know? And maybe it's a little bit more complicated than that, but it's like full disclosure. But part of my problem here, and it's more in the air than specific, is it seems your client knew about the book and the contract, right, from the pre-petition, and the trustee's not complaining. So I don't recall that exactly. I heard you ask the question earlier to the extent it came up in the underlying litigation. And I would just say that I'm not saying it didn't or did not. I didn't work on that underlying litigation. It was in my office. But it's got to be disclosed to everybody, to the trustee. And that's another example of why. So here's some assets that were not disclosed that Mr. Eatman, in one of his briefs, maybe his supplemental brief, talked about kind of like no harm, no foul, because these weren't big dollar amounts that weren't disclosed. The book wasn't worth anything. Just the materiality. And I think we're all going to agree with materiality. That's a very low bar. Fraudulent intent's a little different. And that's why there's a concern about see all these things that are bad but not the basis for a 727 action. See this thing that was explained. I'm going to find that's the basis for the 727 denial of discharge. Well, I think all the other things, those predicate things that he's looking at, I disagree with the judge on that point to the extent he found otherwise. I'm not sure. I don't think he did. It wasn't explicit. I mean, the way his findings were couched were, I'm focusing on the book. So I'm just saying to you, Your Honor, that all those other things that we talked about, I think those do provide the basis for a denial of discharge. So your point is that if take the book aside, remove the book altogether, you can still deny the 727. I mean, deny the discharge of 727. 100 percent, yes. Life insurance policies that were never disclosed. Oh, I wanted to make a comment about an argument that was made about, why amended to address this? You know, putting the policy issue aside, I found case law. There's this In re Beauchamp case, which is a BAP case, which talks about that there seems to be a general, I don't know if it's a rule, Your Honor, but like an understanding that amendments need to be made and assets disclosed by the time of the 341 meeting. The Beauchamp case talks about that. I will tell you that didn't happen here to the extent that's a rule. And I don't know what it is. I don't think that disclosure that's forced out of a debtor at trial on a 727 and amendments filed the day before trial, which aren't of the record here, but didn't disclose everything. I don't think that cures the initial, you know, concealment and especially the false. But how close to Judge Lafferty's point does that move us towards strict liability? I mean, you don't even need to explain why you didn't because you didn't do it by the 341. Therefore, you lost your discharge. So I don't know. I understand the question. I'm sensitive to that, and I hear what you're saying. I wouldn't, I don't think a strict liability type standard like that is necessarily appropriate. But it's like one of these things like when you, I'm not going to come up with the right phrase, but, you know, when it walks and talks like a duck, it, you know, is probably a duck. And I think that's what Judge Sargis found here. So in direct response to your question about when and is it strict liability? Is there a rule that amendments and disclosures have to be fixed or made by the 341? Bootstrap suggests that. I'm not really sure that's 100 percent supportable under other case law. But I just suggest that not disclosing or failure to amend by the time of a 727 trial, maybe that should be strict liability. OK. I don't, I was going to address very briefly. I don't think it is accurate to complain about what the appellant describes as just disparate treatment between him and his wife. Just very briefly, one is the citation is, I think to it in Ray Cox case in the Ninth Circuit, completely different. In that case, it was also husband and wife. And the wife's discharge was denied because the judge, bankruptcy judge found that even though she didn't keep the family business or the, you know, the household's books and records, the husband's failure to do so was imputed to her. Well, that's the opposite of what we have here. Christine, just, you know, no disrespect meant by using first names, testified and the judge believed her. She really didn't know about a lot of these things and the family finances and where the money went and the book, et cetera. So that's a completely different factual scenario. Secondly, back to the credibility determination, the judge found her explanations and responses to questions sitting there in the courtroom, looking at her face, looking at her face, hearing the tone of voice, feeling the vibe. He believed that she really didn't know. And that's the distinction between that finding and what he instead said about Mr. Eatman, which he actually was explicit about both at the beginning and at the end of his findings and conclusions, which is he found Mr. Eatman's testimony not credible. So that's it on the disparate treatment. I, and I guess close, I won't read the quote, but the Bold and Arrow case that's cited in our brief does talk about, and I am sensitive again to this strict liability notion, that one false oath is enough, but what it does is it shifts the burden. And then the debtor has to come back and convince the judge that it wasn't knowing and fraudulent and that finding, that burden of proof obviously wasn't carried here and the judge didn't believe it. And I see my time ticking down and that's all I have. Any other questions? Nothing. Okay, thank you very much. Appreciate it. Okay, Mr. Eatman, you got a couple minutes. Okay, so where we, I want to get to Mr. Dreyer's comments in a moment, but where we left off was at the email supplied by the publisher. And I would love if those could be reviewed closely because you'll see that I'm never on them. Those correspondence, when they did the subpoena, they did so in a way that looked for all kinds of correspondence, including with me, which you'll go see only is limited to the initial onset of the contract many, many, many years ago. And you'll also see, and you'll see it in, and I don't know how the judge saw this, but it was very clear to me sitting on the stand that when they were categorizing an email showing a publishing date, but the title was redacted, which means it clearly wasn't the book I was supposedly writing, but they used it in their vernacular and their presentation as if it was. And that's clearly erroneous and quite frankly, untrue. It's false. So it didn't have anything to do with the book. I think that supports the fact that I would likely not remember. Concerning this pattern of omissions, we did. We didn't know that to include bank accounts that we thought weren't ours. And we explained that to the court and we amended everything. So this comment of never disclosed, I don't know what to say other than yes, we did. But the book contract was never disclosed. It was never amended, was it? No, Your Honor. But I'm saying in context of this credibility and pattern of omissions, because the pattern of omissions here, to me, was fully corrected. It wasn't never corrected to use this exact verbiage. And they were all corrected with the exception of the book, which with counsel, we didn't know where to put it. And that's my explanation. So concerning the pattern of omissions and the supposed character flaws, all I can say is, we amended them in good faith as quickly as we possibly could. And I'm not entirely sure how that could possibly show intent. I was there. It was me. There was never an intent. So I hope that you have enough to see that there was never an intent to fraud anyone. Okay. Well, you're a little over your time. If you want to make one last closing comment, you can. No, thank you. I've enjoyed the hot bench. Well, thank you very much. And we'll take the matter under submission. We'll get your written decision as soon as we can. Thanks for your good arguments. And with that, I think we've concluded the calendar for this month for the BAP. Okay. Thanks very much, everybody. Thank you, Your Honor. Thank you, Mr. Dreyer. Court is adjourned.
judges: Brand, Lafferty, and Spraker